UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ASHRAF HUSSAIN, on behalf of himself and all
others similarly situated,

       Plaintiff,

 -against-

BURTON AND DOYLE OF GREAT NECK
LLC, MARIO SBARRO. and GENNARO
SBARRO,

       Defendants.
------------------------------------------------------------------x

**MEMORANDUM AND ORDER**

14-cv-5924 (SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

 By way of Complaint dated October 9, 2014, Plaintiff Ashraf Hussain ("Hussain" or "Plaintiff") commenced this wage and hour action on behalf of himself and all others similarly situated (collectively, "Plaintiffs") against Defendants 661 Northern Blvd, LLC, d/b/a Burton & Doyle Steakhouse, Burton and Doyle of Great Neck LLC ("Burton and Doyle LLC"), Mario Sbarro, Joseph Zangri ("Zangri"), and Bert E. Brodsky, alleging violations of the Fair Labor Standard Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the New York Labor Law ("NYLL"), N.Y. Lab. Law § 190 *et seq.*[1] *See* Docket Entry ("DE") [1]. Plaintiffs later filed an Amended Complaint on November 17, 2015, which named as defendants only Burton and Doyle LLC, Mario Sbarro ("Sbarro"), and Gennaro Sbarro ("Gennaro") (collectively, "Defendants"). *See* DE [83]. Presently before the Court is Sbarro's motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of all claims asserted against him on

---

[1] Following Plaintiff's acceptance of an offer of judgment pursuant to Rule 68 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), all claims against Defendants 661 Northern Blvd., Zangri, and Bert E. Brodsky were dismissed with prejudice. *See* DEs [23], [37].

1

the basis that he was not Plaintiffs' "employer" under the FLSA and the NYLL.[2] *See* DEs [107], [101]. For the reasons set forth herein, the Court denies Sbarro's motion for summary judgment.

I.   **Factual Background**

The following facts are taken from court filings; the parties' respective Local Rule 56.1 statements; and any admissible deposition testimony, declarations, and exhibits. Unless otherwise noted, the facts set forth herein are not in dispute.

Plaintiffs were employed as waitstaff at Burton & Doyle Steakhouse ("Burton and Doyle" or the "Restaurant")—a restaurant owned by Burton and Doyle LLC once located at 661 Northern Boulevard in Great Neck, New York—on or after October 9, 2011. *See* Mario Sbarro's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Def.'s 56.1"), DE [101-13], ¶ 1; DE [50]; Electronic Order dated May 19, 2015. Hussain, the collective action representative, worked as a server at Burton and Doyle from January 2013 through July 2014. *See* Def.'s 56.1 ¶ 2. Plaintiff Donald Bartunek ("Bartunek"), one of the 28 opt-in Plaintiffs, was a waiter at the Restaurant.[3] *See id.* ¶ 35.

Burton and Doyle LLC is wholly owned by Mario Sbarro LLC, *see* Pechman Decl., Ex. 8, and the Mario Sbarro (2006) Long Term Trust (the "Trust") is the sole member of Mario Sbarro LLC, *see* Declaration of Stuart M. Steinberg in Support of

---

[2] The parties have consented to this Court's jurisdiction for all purposes pursuant to 28 U.S.C. § 636. *See* DE [90].

[3] Bartunek was deposed in this matter and has offered substantial testimony in support of Plaintiffs' claims. *See* Declaration of Louis Pechman in Opposition of Defendant's Motion for Partial Summary Judgment ("Pechman Decl."), DE [108], Exhibit ("Ex.") 5.

2

Motion by Mario Sbarro for Summary Judgment ("Steinberg Decl."), DE [109], Ex. L. Mario Sbarro LLC was incorporated on June 29, 2006, and the Trust was established by Sbarro, as Settlor, on the following day, June 30, 2006. *See* Pl.'s 56.1 ¶ 127; Def.'s 56.1 ¶ 117. Blue Ridge Bank and Trust Co. ("Blue Ridge") is the Independent Trustee of the Trust. *See id.* ¶ 116.

Mario Sbarro LLC's Amended and Restated Operating Agreement dated June 30, 2006 (the "Operating Agreement") identifies Mario Sbarro as the company's sole member. *See* Pechman Decl., Ex. 1. Under the terms of the Operating Agreement, the sole member has "authority to take any and all actions on behalf of the [c]ompany, including without limitation to authorize, consent to[,] and otherwise effectuate the [c]ompany's intended business activities, and all lawful activities the [c]ompany may engage [*sic*] approved by the [sole] [m]emeber." *Id.* § 1(a). The Operating Agreement further provides that Sbarro "shall serve as Managing Director and Manager of [Mario Sbarro LLC] with full authority to act on behalf of the [c]ompany in all business matters and other matters as he, in his sole discretion, deems to be in the best interests of the [c]ompany," and as "Administrative Officer of the [c]ompany with authority to sign such certificates, documents[,] and instruments as may be necessary for tax purposes on behalf of the [c]ompany to qualify the [c]ompany to conduct business activities in any jurisdiction, to provide licenses, permits and approvals as may be necessary for the conduct of the [c]ompany's activities . . . ." *Id.* §§ 2(a), (b). Moreover, the Operating Agreement states that Sbarro shall hold these positions "until his . . . death or until he . . . shall resign . . . ." *Id.* § 2.

The Trust identifies Joseph Sbarro as the "Manager" with sole authority to vote any equity interests held or acquired by the Trust. *See* Pechman Decl., Ex. 15 at 19-20. However, the Trust's terms also give Mario Sbarro the authority "to remove any Manager from time to time and/or to designate additional and/or successor Managers (other than the Settlor)." *Id.* at 22.

Before the Restaurant opened, Sbarro, Inc.—an entity of which Sbarro at one time served as the chief executive officer—operated a restaurant named Salute also located at 661 Northern Boulevard.[4] *See* Def.'s 56.1 ¶¶ 52, 53; Pechman Decl., Ex. 2, 18:21-19:9. According to Sbarro's deposition testimony, Sbarro, Inc. was the sole owner of Salute. *See* Declaration of Laurie Sayevich Horz in Support of Motion by Mario Sbarro for Summary Judgment ("Horz Decl."), DE [101], Ex. D, 15:25-16:7. Sbarro further testified that, when Salute "wasn't doing well," he and his partners "thought that perhaps a steakhouse might be better." Pechman Decl., Ex. 2, 20:5-9. As a result, in approximately 1998, Salute was "transition[ed]" from Salute to Burton and Doyle. *Id.*, 19:24-20:4. At or around that time, Sbarro was involved in the decision to add a sushi bar to the Restaurant. *See* Plaintiffs' Rule 56.1 Counter-Statement of Undisputed Material Facts ("Pl.'s 56.1"), DE [108-17], ¶ 126. On April 7, 1999, a New York State Liquor License for Burton and Doyle was issued to Sbarro as "Principal" and remained active until June 30, 2015. *See* Horz Decl., Ex. J; Pl.'s 56.1 ¶ 125. Following the "transition" from Salute to Burton and Doyle, Sbarro, Inc.

---

[4] Sbarro's Local Rule 56.1 Statement does not provide the timeframe during which he served as the CEO of Sbarro, Inc. During his deposition, Sbarro testified that he held this position for "quite a few years," *see* Pechman Decl., Ex. 2, 19:7-9, but he has not provided any further detail in this regard in connection with the instant motion.

4

owned 40% of the Restaurant, and Anthony Scotto Company and Sal Moscato owned the remaining 60%. Pechman Decl., Ex. 2, 16:3-10, 21:10-22:6. Sometime thereafter, "the family" sold Sbarro, Inc. and ownership of the Restaurant "went to [Sbarro's] brother, Anthony, who later decided to sell[]" "these assets" to the Trust. *Id.*, Ex. 2, 16:22-17:10. It appears that this sale of assets was effectuated through a Member Share Purchase Agreement dated June 29, 2008, pursuant to which all shares of Burton and Doyle LLC were transferred to Mario Sbarro LLC. *See* Pechman Decl., Ex. 8.

In 2009, Sbarro asked Gennaro to serve as General Manager at the Restaurant in an effort to improve its operations. *See* Pl.'s 56.1 ¶ 134. The two discussed the amount of time and compensation involved in taking on the position and agreed that Gennaro's compensation would be contingent on whether the Restaurant became profitable. *See id.* ¶¶ 135, 136. They did not, however, "go into specifics" about Gennaro's responsibilities as General Manager. *See id.* ¶ 137. According to Sbarro's testimony, after Gennaro assumed the General Manager role, he would "occasionally . . . ask [Sbarro] a question" about the Restaurant's operations. Pechman Decl., Ex. 2, 38:3-11. In addition, Sbarro "would go there once in a while," approximately every one to two months, as a "guest." *Id.*, 38:11-12; Pl.'s 56.1 ¶ 139; Def.'s 56.1 ¶ 68. In connection with such visits, Sbarro would tell Gennaro if he was "happy" or "unhappy" about the Restaurant's food quality, sanitation, and cleanliness. *See id.*, 38:11-17. During his deposition, Gennaro confirmed that he spoke with Sbarro about how the Restaurant was doing. *See* Pechman Decl., Ex. 3, 17:2-6; Pl.'s 56.1 ¶ 142. For example, on one occasion Gennaro told Sbarro that the Restaurant was struggling

5

but that it had prospects. *See* Pl.'s 56.1 ¶ 143. Sbarro was also aware that the Restaurant was never profitable. *See id.* ¶ 145.

Hussain and Bartunek each encountered Sbarro at the Restaurant on several occasions. It is undisputed that, at Sbarro's request, Gennaro directed Hussain to fix the curtains in the Restaurant "to make sure th[e] place looked a little more bright." Pechman Decl., Ex. 4, 163:16-24; Pl.'s 56.1 ¶ 160. Further, Hussain twice observed Sbarro "go[ing] to the office in the basement" of the Restaurant. Pechman Decl., Ex. 4, 168:14-169:4. A number of times, Bartunek waited on Sbarro when he dined at the Restaurant. Pl.'s 56.1 ¶ 140. According to Bartunek, Sbarro would never receive a bill for his meals. Pechman Decl., Ex. 5, 142:14-19. Additionally, Bartunek observed Sbarro "walking around pointing things out" at the Restaurant before his shift. Pl.'s 56.1 ¶ 156. Bartunek also testified that Sbarro was present in the Restaurant during employee meetings that took place before the employees' shifts. Pechman Decl., Ex. 5, 130:7-131:24, 127:16-21; Pl.'s 56.1 ¶ 164. If employees complained to a manager about a work-related issue, the manager informed them that he would speak to the owner of the restaurant. *See* Pl.'s 56.1 ¶ 166. Both Hussain and Bartunek understood Sbarro to be the owner of the Restaurant. *See* Pechman Decl., Ex. 4, 172:18-22; Pechman Decl., Ex. 5, 140:5-14.

In or around 2014, Sbarro's daughter Carmela Merendino ("Merendino"), who was handling accounts payable at the time, reported to Sbarro that the Restaurant was running in arrears and was getting worse each month. *See* Pl.'s 56.1 ¶ 170; Pechman Decl., Ex. 2, 26:20-25. As a result, Sbarro informed Frank Montgomery ("Montgomery"), the attorney for the Trust, that it was a good idea to sell the

6

Restaurant because it was not profitable. *See* Pl.'s 56.1 ¶ 171. Sbarro had multiple conversations with Merendino regarding the Burton and Doyle's financial condition and the potential sale of the business. *See id.* ¶ 172. It is thus undisputed that Sbarro knew the business was not doing well. *See id.* ¶ 173. Consequently, Sbarro negotiated the sale of the Restaurant to Zangri with the assistance of broker Charles Navarro of Breslin Realty for $2.5 million. *See id.* ¶ 177. Sbarro never discussed the sale with Gennaro, nor was Gennaro otherwise involved in the sale. *See id.* ¶ 167, 174. Rather, Gennaro was given 36 hours' notice by Merendino that the Restaurant had been sold and that they had to do an inventory and close up. *See id.* ¶ 167. On June 27, 2014, *Newsday* published an article regarding the sale that identified Sbarro as the owner and operator of Burton and Doyle. *See* Pechman Decl., Ex. 11. Breslin Realty then issued a press release on July 14, 2014, which also suggested that the Restaurant had been owned and operated by Sbarro. *See id.*, Ex. 10.

## II. Summary Judgment Standard

Pursuant to Fed. R. Civ. P. 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing that there are no issues of material fact such that summary judgment is appropriate. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004). In deciding a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361

F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986) (holding that a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the movant has met its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986) (internal quotation omitted); *see also Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 542 (E.D.N.Y. 2014) ("An issue of fact is considered 'genuine' when a reasonable finder of fact could render a verdict in favor of the non-moving party."). In determining whether summary judgment is warranted, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986); *see also Artis v. Valls*, No. 9:10-CV-427, 2012 WL 4380921, at *6 n.10 (N.D.N.Y. Sept. 25, 2012) ("It is well established that issues of credibility are almost never to be resolved by a court on a motion for summary judgment.").

## III. Discussion

Sbarro contends that he cannot be classified as an employer under the FLSA and the NYLL, and that summary judgment in his favor is therefore warranted, because there is no evidence that he either owned Burton and Doyle or was involved

8

in its operations. In opposition, Plaintiffs argue that Sbarro was in fact the owner of the Restaurant and did exercise his authority to control its operations.

### A. Legal Standard

Any "employer" under the FLSA who violates the statute's provisions may be held liable for such violations. *See, e.g.*, 29 U.S.C. § 207(a)(1). The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." *Id.* § 203(d). To determine whether an individual is an "employer" under the FLSA, the Second Circuit utilizes the economic realities test, which focuses on "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry v. Catsimatidis*, 722 F.3d 99, 104–05 (2d Cir. 2013) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir.1984)). In addition, the analysis depends on whether the defendant had "operational control" over employees. *Irizarry*, 722 F.3d at 110. Operational control does not necessarily require direct contact with employees and their workplaces; instead, "[a] person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Id.*

These factors do not "'comprise a rigid rule for the identification of [an] FLSA employer,' but rather provide a guideline 'to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA.'" *Jin Dong Wang v. LW Rest., Inc.*,

9

81 F. Supp. 3d 241, 253 (E.D.N.Y. 2015) (quoting *Irizarry*, 722 F.3d at 105). Indeed, "[a] district court is 'free to consider any other factors it deems relevant to its assessment of the economic realities.'" *Id.* (quoting *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71-72 (2d Cir.2003)). "The question of whether a defendant is an employer under the FLSA is a mixed question of law and fact, with the existence and degree of each relevant factor lending itself to factual determinations." *Berrios v. Nicholas Zito Racing Stable, Inc.*, 849 F. Supp. 2d 372, 393 (E.D.N.Y. 2012) (citations omitted). Hence, "individual employer liability is rarely suitable for summary judgment." *Id.*[5]

**B. Analysis**

Applying the standards outlined above, the Court finds that summary judgment is inappropriate because questions of material fact exist regarding whether Sbarro was Plaintiffs' employer under the FLSA and NYLL. Initially, the Court is unable to determine from the record whether, as a matter of law, Sbarro had the authority to control the Restaurant's operations during the relevant timeframe.[6] The Operating Agreement of Mario Sbarro LLC, the entity that owned the Restaurant, provides that Sbarro "shall serve as Managing Director and Manager of [Mario Sbarro LLC] with full authority to act on behalf of the [c]ompany in all business

---

[5] The NYLL's definition of "employer" mirrors that of the FLSA. *See* NYLL §§ 190(3), 651(6). District courts in this Circuit have therefore "consistently interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA.'" *Inclan v. New York Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 511 (S.D.N.Y. 2015) (quoting *Ho v. Sim Enters. Inc.*, 11 Civ. 2855, 2014 WL 1998237, at *10 (S.D.N.Y. May 14, 2014)); *see Santillan v. Henao*, 822 F. Supp. 2d 284, 292 (E.D.N.Y. 2011) ("New York's Labor Law is the state analogue to the federal FLSA").

[6] Curiously, in support of his motion for summary judgment, Sbarro elected not to submit complete copies of either the Operating Agreement or the Trust, the documents that appear to speak most directly to the question of ownership and control of the Restaurant. Both documents have instead been offered by Plaintiffs in opposition to Sbarro's motion.

matters and other matters as he, in his sole discretion, deems to be in the best interests of the [c]ompany," and as "Administrative Officer of the [c]ompany with authority to sign such certificates, documents[,] and instruments as may be necessary for tax purposes on behalf of the [c]ompany to qualify the [c]ompany to conduct business activities in any jurisdiction, to provide licenses, permits and approvals as may be necessary for the conduct of the [c]ompany's activities . . . ." *Id.* §§ 2(a), (b). Additionally, the Operating Agreement states that Sbarro shall hold these positions "until his . . . death or until he . . . shall resign . . . ." *Id.* § 2. Sbarro has submitted no evidence that he formally resigned at any time beyond his vague testimony regarding his retirement. *See* Pechman Decl., Ex. 2, 27:14-17 ("The restaurant was for the benefit of my heirs, children and grandchildren, and when I sold Sbarro, I retired from the restaurant business and I wanted to hear nothing about it."). A reasonable jury could thus determine that Sbarro held the positions of Managing Director, Manager, and Administrative Officer of Mario Sbarro LLC throughout the relevant timeframe.

With respect to the terms of the Trust as they affect Sbarro's authority to manage Burton and Doyle, Sbarro merely submits an affidavit of Dottie Jones ("Jones"), an Assistant Vice-President and Trust Officer at Blue Ridge, which concludes that "[t]he terms of the Trust . . . do not grant Mario Sbarro any control or operational authority over any businesses the Trust owns, either directly through a subsidiary," and that "Sbarro does not have any voting rights with respect to any stock or membership interest of any corporate entity that the Trust owns." Horz Decl., Ex. H ¶¶ 3, 4. However, the terms of the Trust itself, a complete copy of which

11

was submitted by Plaintiffs in opposition to Sbarro's motion, contradict Jones's statement in that they give Sbarro, as Settlor, the ultimate authority "to remove any Manager from time to time and/or to designate additional and/or successor Managers (other than the Settlor)." Pechman Decl., Ex. 15 at 22. Although the Trust does not permit Sbarro to appoint himself as Manager, he nevertheless retains a large degree of control by virtue of having the discretion to designate Managers of the Trust. Accordingly, questions of material fact regarding Sbarro's authority to exercise operational control of the Restaurant exist.[7]

Plaintiffs have, moreover, offered undisputed evidence that Sbarro exercised at least some level of control of the operations at Burton and Doyle, irrespective of whether he had the legal authority to do so. In particular, Sbarro was responsible for opening Burton and Doyle as a steakhouse, Pechman Decl., Ex. 2; deciding to add a sushi bar, Pl.'s 56.1 ¶ 126; and selecting Gennaro as General Manager and establishing the terms of his compensation, Pl.'s 56.1 ¶ 134-36. Gennaro would at times ask Sbarro questions about the Restaurant's operations. Pechman Decl., Ex. 2, 38:3-11. Moreover, Sbarro dined at the Restaurant every one to two months and told Gennaro if he was satisfied with the Restaurant's food quality, sanitation, and cleanliness. *Id.*, 38:11-17; Pl.'s 56.1 ¶ 139; Def.'s 56.1 ¶ 68. On one occasion, Gennaro directed Hussain to fix the curtains in the Restaurant "to make sure th[e] place looked a little more bright." Pechman Decl., Ex. 4, 163:16-24; Pl.'s 56.1 ¶ 160. In addition,

---

[7] Notably, Breslin Realty's press release and the *Newsday* article each identifies Sbarro as the owner of Burton and Doyle. The Court deems these items relevant to its assessment of the economic realities when viewed in the context of the additional evidence that militates against summary judgment here. *See Jin Dong Wang*, 81 F. Supp. 3d at 253.

Bartunek observed Sbarro "walking around pointing things out" at the Restaurant. Pl.'s 56.1 ¶ 156. Sbarro was also present at Burton and Doyle during employee meetings that took place before the employees' shifts. Pechman Decl., Ex. 5, 130:7-131:24, 127:16-21; Pl.'s 56.1 ¶ 164. The evidence further demonstrates that Sbarro kept abreast of the Restaurant's financial condition. *See, e.g.*, Pechman Decl., Ex. 3, 17:2-6; Pl.'s 56.1 ¶¶ 142, 170-72. It is similarly undisputed that Sbarro both recommended to Montgomery that Burton and Doyle be sold and negotiated the sale with Zangri. *See* Pl.'s 56.1 ¶¶ 171, 177.

In addition to these undisputed facts, Plaintiffs have presented further evidence from which a jury could reasonably conclude that Sbarro was an employer under the economic realities test. According to Plaintiffs, it was widely understood that Sbarro was the owner of Burton and Doyle and that Gennaro ran the Restaurant for his father, *see* Pechman Decl., Ex. 4, 172:18-22; Pechman Decl., Ex. 5, 140:5-14, and managers informed them that any complaints about work-related issues would be brought to the owner's attention, Pl.'s 56.1 ¶ 166. Bartunek also testified that Sbarro did not receive bills for his meals when he dined at the Restaurant, *see* Pechman Decl., Ex. 5, 142:14-19, and that Gennaro would "go to the office to report to [Sbarro] every Monday[;] he will come to the office and get the paper work[,]" *id.*, 149:4-6. Moreover, Bartunek claims managers told him that Sbarro had the ability to have anyone fired, and that he had in fact done so on at least one occasion. *Id.*, 144:20-25, 155:5-14. Bartunek further testified that manager Paul Vaccese told him that he was hired by Sbarro. *Id.*, 145:5-9. Accordingly, Plaintiffs have submitted evidence that Sbarro had the power to, and did in fact, hire and fire employees, and

13

that he supervised and controlled conditions of employment. Though there is only scant evidence in the record that Sbarro determined methods of payment and maintained employment records, these fact are not dispositive. *See Jin Dong Wang*, 81 F. Supp. 3d at 255. Finally, Plaintiffs have offered evidence of operational control because significant decisions made by Sbarro—such as choosing to add a sushi bar, naming Gennaro as General Manager, and ultimately deciding to sell the Restaurant, directly affected the nature or conditions of the employees' employment. *See Irizarry*, 722 F.3d at 110.

In sum, considering the totality of the circumstances and viewing all evidence in the light most favorable to Plaintiffs, the Court concludes that there are issues of material fact regarding "the existence and degree of each relevant factor," *Berrios*, 849 F. Supp. 2d at 393, pertaining to whether Sbarro was an "employer" under the FLSA and NYLL. Accordingly, Sbarro's motion for summary judgment is denied.

## IV. Conclusion

For the reasons set forth above, the Court denies Sbarro's motion for summary judgment.

Dated: Central Islip, New York
      March 30, 2018                    **SO ORDERED**

                                                    s/ Steven I. Locke
                                             STEVEN I. LOCKE
                                           United States Magistrate Judge